may it please the court your honor could you give me one minute I'm one step behind here sorry I think we're ready thank you Benjamin Ramos on behalf of appellant apprentice Marshall may it please the court the issue the certified issue before the court is whether mr. Marshall's statements to detectives were voluntary under the totality of the circumstances and I wanted to focus on three factual areas that weren't discussed thoroughly in the briefs to support our argument our contention that is counsel could you maybe move the mic a little closer thank you so I'd like to address three factual areas that we contend exhibit or demonstrate that mr. Marshall's confession was not voluntary the first area is the timing of the mark of the Miranda warnings in this case it's not clear in the briefs it sort of reads like the detectives showed up at the second hospital they had a brief conversation with mr. Marshall and then they told him anything you say is voluntary and then they gave him a random warnings but that's the absolute wrong impression because the excerpts of record show at 4 er 417 through 418 that those two admonitions you don't have to talk to us and Miranda came at page 9 of the transcript and it's easy to overlook that because it's page 1 and then it goes to page 9 so 8 pages of that transcript are just missing and it's really easy to overlook that which unfortunately I did in briefing can I ask you we've been over this carefully you take this case certainly very very seriously but there I think there are some gaps and you just mentioned missing transcript so my first question is I don't see the audio anywhere is that right the district court didn't have the audio as far as I know your honor that's correct the reason I ask that it's for the benefit of both lawyers is that there's several places in the transcript where it says unintelligible or inaudible one of the one of the other so I wondered if he actually heard it and then the second is what you're going to now we just have we do not have that entire transcript and when I say that entire transcript we don't have anything from the first hospital right and then at the second hospital we have the first portion of the detectives talking to him and as you said it takes several pages to get to the point several pages of we're here to help you kind of types of comments before we get to that admonition so what did the district court have the district transcript how much did the district court have as far as I know the court had what you have they had the same parts are missing for the district court as far as I know I would I didn't represent mr. Marshall in the district court so I wouldn't swear to that but that's my understanding that is my understanding as well so I'll just put both counsel knows that's my understanding as well and I think that's the panel's understanding so go right ahead thank you so that that's a very important fact that the Miranda warnings came I don't know how long it takes to acquire eight pages or nine pages of there any excuse me is there any thing in the record which suggests that the Nevada courts somehow thought that page 9 came immediately after page 1 I wouldn't I don't think that that specifically I don't think there's anything in the record to indicate that specifically but I think the way the Nevada court characterized those facts one could get the impression that the state court believed that the Miranda warnings and the other admonition came shortly after the detectives first met mr. Marty what are you specifically pointing to in that regard as an unreasonable determination of the facts by any Nevada court well there was no discussion of timing which is very important because the longer a suspect speaks with police without more Miranda warnings the more likely it is that there may be coercion or statement well there's no requirement that the court the state court discuss everything is there anything that you can point to where they got it wrong on this issue I believe I believe the short answer is yes I would have to review the the wording it's in the wording of their discussion of that issue where they they they mentioned that detectives arrived at the hospital and they and then they quote the detectives as saying we're just here to help you out and then they mentioned that anything you say is voluntary and then they issued Miranda warnings and I'm paraphrasing that but the the construction if anyone read that it sounds like you'd think that the Miranda warnings came shortly after they arrived and you'd be completely misleading because there was nine pages of transcript that occurred between I looked to follow up on this point I look for the audio more precisely my clerk look for the audio we can't find the audio I can't see that there's a discrepancy between that what what the trial court had and what we have but I but I also look to see sometimes transcripts or our date timed you know a time stamped is what I should say you the transcript or the audio so that we perhaps could look to see not only how many pages went by but how many minutes went by I don't think we have that I don't but I don't believe we have that either although the next best thing we have is detective Serena which is estimate where he says it was about 15 minutes of this of interaction with mr. Marshall before the Miranda warnings were first given and then he adds to that statement we earlier told him that everything you say is voluntary so he doesn't say how how much earlier he doesn't say right when we showed up we told him that or five minutes later he just says earlier but so I think 15 minutes is a fair estimate because in the transcript that we do have the Miranda warnings do follow I think about two or three paragraphs after he says anything you say is voluntary okay so just looking again at the clock and I wanted to make sure you get all the time you you need here the question is whether his will was overborne and that's what we're looking at that's what that was the question certified and so one consideration you want us to take into account is that you think it took 15 minutes that might be right one is that it's 5 in the morning and he'd been I think up all night that we don't really know that but it appears that he may not have slept there's the morphine it so it seems it's a half dose of morphine whatever that is but the nurse told the detectives that he was lucid and sitting up I don't see any other indication to the contrary right what else have what other circumstances do you want us to focus on please what two points the mr. Marshall's medical records show at 430 he was still in pain he said his pain was a 5 on a scale of 1 to 10 at 4 30 in the morning and then at 530 another entry shows that he was given a dose of morphine his pain was still between a 3 and a 5 so he was in he was in pain it's hard to say well how bad is that 3 to 5 it's he was uncomfortable so I think that's important to consider but the other thing that wasn't mentioned or anywhere is the detectives repeatedly told mr. Marshall this is your one chance to be honest with us he took they told him that four times you're one chance when that was not true and immediately after he that was coercive because it was intended to make him believe if I don't tell my version of what happened now I'll never get the chance I can't do it a week and that's just not true so that was unconstitutional going to what we've said in other cases police are permitted to do correct and and there's a fact that I've thought about sort of both ways I'm sure you have as well it looks like that detectives thought he was a minor at the time they thought he was 17 and in addition to them having that impression it seems that he told hospital personnel that that the hospital records indicate his date of birth put him at age 17 and the trial court I think look to that perhaps the district court did and consider that he was all of these things he'd been shot he was medicated on the other hand he's described as being lucid and he's also fabricated that's what that was the court's word I think fabricated a story about having been shot himself as you know and then is maybe even intentionally giving his age incorrectly so that he's viewed as a juvenile perhaps to avoid responsibility that that suggests he's doing pretty well in terms of his cognitive capacity or at least that's the suggestion here I want to give you a chance to respond to that it's really difficult to to speculate as to his cognitive functioning we just have the record to deal with what I would say is that his admission did come immediately after the course of statements about this is your only chance and before that he had he had he had admittedly he had told a different story he had not told the truth but I think that the fact that he also waived his rights without any any deliberation a lot of people would like to think about that and say well I'll call my parent or let me think about that for a minute he immediately gave a new story well but he's he called them back right yes that's correct he lied to them the first time right that's correct and then I can't remember what the interval was he told the nurse he wanted to talk to them again that's correct so he waived his rights after he had called the officers back because he wanted to change his story from what was a lie well I think that's a little bit unclear your honor because it was a lie no no it was unclear that he waived his rights at that point because they didn't advise him until after he called but but I mean you're you're talking about how after he waived after he was given the Miranda warnings he immediately decided to waive them and that somehow that indicates involuntariness am I understanding your I think it I think it helps suggest coercion yes yeah but confusing the sequence so do you mind if I jump in and because I might have it wrong my understanding is that if we're going to talk about a first conversation that's at the I'm thinking of that as the first hospital and and with officer Smith and that's a lie he said he was a robbery victim then at the second hospital is that UCMC UMC yes your MC the detective showed up at 5 in the morning and that that's where this we see this transcript first when they're telling him that we were here to help you out and whatnot and in that conversation which I'm thinking of is the second but I think judge Bennett is referring to as the first doesn't matters first with the detectives right he's already told the lie to to to officer Smith with those in that second conversation which is the first conversation with the detectives in that conversation do you not make very incriminating statements no that's when he lied he lied for maybe 15 minutes and then that's when they told him when we talked to Sal we know everything that happened and you this is your one chance and then he made anything they left and he called them back and then he admitted he called them back I thought he called them back to to to talk about the consequences of what he just said in the first conversation which is which it included a concession that he had shot at the individual he was trying to rob my understanding was it Miranda's him and what I'm thinking of as the third conversation is that not right I would have to read it my understanding was that he wanted to know his consequences after he finally told him that his true version that's my that's true he definitely when he called them back it was 10 minutes after the second conversation he called him back and the records very clearly called back so he wanted to know what the consequences were of what he just told them and my understanding is the consequences of what he just told them are quite incriminating it's not a confession exactly but it's yes I think your sequence is the way I understand that is that I don't think that's what counsel was saying and I just wanted to clarify that but it sounds like judge Bennett and I both understand that the same way I think that's correct so the first tech of this state first statement to detectives there's no confession but there are coercion tell us now or you'll never get another chance we know everything and then he thinks about it apparently and he calls him back and that's when they say well wait a second we have to Miranda is a year minor so you can have a parent here if you want and he immediately says well I just wonder what my consequences are that's the sequence he doesn't question oh well good idea I'll call my I'd like to have my parents here before I talk to her he just immediately admits and wants to know what his consequences are to me that shows coercion I don't think I think the records quite clear that the detective said that what he said in what I'm calling the third conversation mirrored what he had already told them in the second conversation I don't think there's anything more or different after the Miranda well after Miranda I think he he admits he makes admissions that he didn't make the first time they spoke to detectives that's how I understand it well I mean the the Court of Appeals said with regard to what judge Kristen is describing as the second conversation ultimately Marshall confessed to activities which implicated him in the Nettleton shootings the detectives then concluded the interview approximately 10 minutes after a nurse informed the detectives that Marshall wanted to speak to him again so my understanding of the record is that at this hospital he essentially confessed that interview was done and then he told the nurse I want to talk again after he had essentially already confessed and I did not see anything in the record to indicate that the court of the Nevada Court of Appeals factual determination sequence wise was in error and I think the confession I think the confession was a little more detailed though the second time although he did admit in the first confession I shot at the direction so he puts himself at the crime shooting a gun which is I think we're now saying the same thing yeah but go back if you could because of course we don't take up too much your time on that sequencing I think we understand the sequence are there other factors you want us to consider to buttress your argument that his will was overborne I would also repeat the just the totality of the circumstances as argued in my brief he went to two hospitals he had an officer stationed outside his door for four or five hours at the second hospital that really only can be construed as a sign of authority he didn't receive visits from any evidence that he was aware that the officer was outside but not from him specifically but the officer did mention that he was I'm sorry that she was in and out of the room occasionally so I would I would think he was in uniform and she said she was in and out yes I don't know the extent to which and it doesn't sound like there was any further conversation with her correct but he had I mean isn't isn't it potentially relevant to the assessment of the significance of that fact that he had he had claimed to be the victim of a crime right so it was for someone who was the victim of a crime it would be quite natural that there might be an officer hanging around trying to talk to him to take his report of of the crime of which he had been a victim right well correct your honor and that officer did at the first hospital she spoke to him for about 40 minutes 30 to 40 minutes in her words and then she followed him to the second hospital and stayed outside his room for another three or four hours until detectives arrived so she already had his statement and didn't question him anymore so there was really no reason for her to stand outside his hospital room for another three or four hours there's no I'm sorry there's no reason even though he said somebody just shot him he had already he had already told the police he already told the first officer what had happened and she had written it down she had they spoken for 30 to 40 minutes and there's nothing on the record to indicate that she was there to protect him well she did say actually that she was she went to the second hospital because her supervisor told her to go there and she did say that it was their policy that they would stay with a shooting victim or general practice she wasn't there to take another statement she'd done that I'll give you that but we don't have anything in the record to indicate why there was a police hold in the record entered as a doesn't seem that anybody to be the case that anyone knows where that came from and and officer Smith said she thought he wouldn't have been free to go corrector he was he was hooked up to some kind of equipment there's that I think and and then the both detectives said that they didn't as I understand it but I want to give you a chance to respond I think both detectives said that they did not know a lawyer was trying to reach him they did not prevent family from going in and that they didn't not enter a police hold at least not until after he had made his incriminating statements yes they did that's all correct our but there's also testimony from a witness who said that for mr. Marshall's sister who said we she and someone else tried to visit him and they she was directed by police officers to a waiting room and was informed you can't visit him he's being booked into custody that's why there's conflict important if the question is whether his will is overborne that's the import I think of judge Miller's question did he was he aware that the police officer was there standing guard was he aware that his family or even an attorney was trying to reach him I can't see anything in the record sir that says that he was aware of those things well I think they're fair inferences because he his sister drove him to the hospital so I think it would be odd that she would drive him to the hospital and then just vanish for the next day I would think any reasonable person would expect to see a family member visiting them as soon as they can judge Miller do you have other questions judge Bennett all right so when you come back we'll put two minutes on the clock you can plan accordingly you're well over your time but just so you know you can plan on two more minutes thank you you're welcome we'll hear from the state please good morning your honors may it please the court my name is Katrina Lopez and I represent the respondents in this matter this court should affirm because Marshall's confession was voluntary and not the product of coercion in Mincy a statement is voluntary if it's the product of free and rational choice and unlike Mincy Marshall's wounds were not life-threatening he was 18 years of age at the time of the interview he was awake sitting upright in his bed and alert he was not under the influence and he although he had half a dose of morphine in his system the nurse explained that there were no issues with him communicating with detectives I know I'm interrupting your sequence but but my question does pertain to what you just mentioned you've heard me say that there's trouble with trying to figure out this transcript we only have a small piece of it for some reason we don't have the audio so we don't have any timestamp I don't know how long this all took and the other thing is there's an awful lot of places where it says it reads unintelligible you know for them when whoever was trying to type it up couldn't I think understand what was being said do we have anything to explain that whether the microphone was rustling or whether he was slurring his speech perhaps or or anything else no your honor we do not we basically have the transcript from the motion to suppress hearing to create the sequence of when things occurred during from the time of North Vista Hospital to UMC is there anything in the record anywhere that would allow us to know how much time passed during you know from the time the NS detectives originally started talking with him when they said they're here to help him out and give him a chance to tell his side of the story how long did all of that take so from my understanding the 50-minute interview with the detectives at UMC so mr. Marshall was admitted at UMC at 430 a.m. that's in 2 ER 0 9 3 then he had a 50-minute interview with detectives 3 ER 354 through 356 that interview started at 5 o'clock a.m. 3 ER 344 the detectives provided an introduction and then they basically stated that they were just coming out there to talk to Marshall to find out what happened I'm just trying to figure out my questions really specific we just don't have for some reason the entire transcript we don't even have the incriminating part of the transcript I'm just trying to figure out I think one of the detectives said it took about 15 minutes from the beginning of the interview of the 50-minute interview until they got to the part that we've been focusing on do you have any is there anything in the record that would allow us to nail that down other than the detectives estimate no your honor all right thank you and so in Mincy a statement is voluntary if it's the product of free and rational choice and so as previously stated Marshall was not under the influence the detectives never prevented Marshall from speaking to friends family or his attorney and also Marshall's confession was not the product of coercion and that his will was not overborne in Ross coercion occurs when there is course of police conduct and that conduct results in the statements being made here the officers never threatened harmed or pressured Marshall they basically asked him to tell us what happened which is in one SCR 095 the detectives told Marshall that anything he said was voluntary and he had the right to request the detectives to leave the hospital room at any time that's in 2 er 267 3 er 354 and 3 er 357 through 358 so we're really familiar with this record and I appreciate that you are to I appreciate your preparation very much another thing that happened that hasn't had much airtime here's that there was a another statement that was taken that that was suppressed because the trial court made a finding that he clearly asked for counsel in that last statement and they and and then and the officers pressed on and ultimately the state lost on that argument and that statement was suppressed so if we put that together with the missing transcripts what should we which we do about that so we be concerned about that well we should determine that the district court was correct and determining that the Nevada Appellate Court's decision was not an unreasonable determination of the facts based on he's arguing is that it may have been unreasonable and I just want to push back and have you respond to this right that given that history to what there's a concern that apparently rose to a constitutional level about that last statement that his constitutional rights were not honored or leave it you take that as a hypothetical if you want whatever you want I'm not trying to just putting that out there and then there's this missing transcript and you're asserting your clients view of what in the part of the transcript that we have but should we draw any inferences about the reasonableness of the court state court making the factual determinations that are at issue here given that we have a big chunk of the transcript missing no your honor because there's nothing in the record there's nothing stating that Marshall did not want to talk to detectives while at UMC yes the statements that he made at the at the detention center those were suppressed they granted the motion to suppress but based on just the totality of the circumstances at the time that he was at the hospital speaking with the detectives there's nothing saying that he invoked his right to counsel there's nothing saying that he didn't want to speak to detectives in fact he actually volunteered information so here's the problem we only know what we know we don't know what's missing so to get back to judge Bennett's point of the very important standard of proof here this is quite a burden but the question is whether there's a reasonable fact-finding so when you say there's nothing in the record to show that his will was overborne there's a big part of the record missing and apparently the trial court didn't have it either so or the earlier courts that have looked at this case and I'm just trying to get your response on whether or not that's in a reasonable way to proceed given that there's some concern there was a lot of concern about that last statement and about the fact that the state's really relying on the fact that he never made certain statements and we don't know what was said in the part of the transcript we don't have what about that we would still have to give deference to the state court findings that they reviewed the transcripts they reviewed the statements and they made the reasonable determination that his statements were voluntary and that they were not a product of coercion as far as far as you're aware in the state court or in the district court was there any objection made by petitioners counsel that somehow parts of the record were missing and that somehow prevented the Nevada courts or the district court from reasonably determining the facts one way or another because there was an incomplete record no your honor that was not stating the record do we know from the record or can you tell us whether the state court had the entire transcript it does not state in the record if they had the entire transcript okay these aren't two questions I'm really just trying to leave no stone unturned they're very serious consequences in this case my other question is whether since I guess all resulted in a plea agreement is there any part of the plea agreement that limited the record that was to go forward on the on the remaining question here I'm sorry your honor could you please ask the question again I think I've already answered it myself it's it's okay you've told me that that you there's nothing in the record that's gonna tell me that the state court did or did not have the entire transcript is that it yes yes your honor and also when discussing Williams the detectives never discussed the specifics of Williams of what Williams said nor did they discuss the facts regarding the shooting all they said was that what you're telling us is different from what Williams said but they don't go into any evidence you don't go into any details and so his will was not overborn also the detectives never promised Marshall any leniency in exchange for speaking to them they just basically said that they wanted to help Marshall out and also the interview lasted less than one hour the interview was only 50 minutes the officer testified at the motion to suppress hearing that Marshall was not in custody the detectives testified that he was not in custody and also the police hold from the interdisciplinary reports from UMC which is 3 ER 433 that there was no police hold until 645 which is after the second interview and so when you look at all of this considered together the federal district court was correct in determining that the Nevada appellate courts determination was not contrary or an unreasonable application of clearly established law and that the determinations was not unreasonable based on the facts presented in the state court I don't think we have other questions thank you your honor she mentioned Mincy and that case really is I think applicable the important difference there is that mr. Mincy was told that he was under arrest and given Miranda warnings before the questions that that's a really important consideration the state court also concluded in its ruling that the police never threatened or pressured mr. Marshall which I think is is an unreasonable factual determination as I discussed earlier there is enormous pressure to confess now or he would never get another chance they told him repeatedly this is your one chance to tell us otherwise we're gonna you're gonna be stuck with what your friend said that was coercive and as to the state court record in reviewing the voluntariness issue the state court is not entitled to any deference this court reviews that de novo and independently so I don't think the court is why is that why do we review de novo the the voluntariness issue is reviewed by this de novo and and counsel mentioned that no under 2254 D don't we need I mean in order to grant relief the federal court needs to find the state court either unreasonably determined the facts or unreasonably applied clearly established federal law as determined by the Supreme Court right yes so that's not de novo I think you're skipping ahead you've argued that there was an unreasonable determination of the facts and you're flipping to de novo review I think you just did that without articulating it is that right I think there's a big hurdle between you and de novo review so can you just clarify or are you saying we review the district court de novo oh that's that yes you're okay okay I'm a subject we do not review the state courts determination de novo though correct but if I understood counsel she was saying that maybe she can clarify but I think she was saying that about the gaps in the record we'd have to give it deference that this court would have to give a deference yes we give the state courts fact findings of fact deference okay but as to the voluntariness issue though that is what is reviewed to know that's the point I was trying to make we take your point I think we're gonna push have a different view of the applicable standard but it's one we're very familiar with so go right ahead with your comments thank you so I think under the totality of the circumstances the police questioning was coercive in this case it's undisputed that many lies were told and the police are allowed to lie to suspects they're allowed to trick them but there's a point when it crosses the line and it has to be determined on a case-by-case basis and under all the facts of this case I think that line was crossed mr. Marshall was vulnerable as in Mincy they're there they're very strong parallels he was basically at the of the police which is the language that Mincy used that mr. Mincy was at the mercy of detective Hurst or Hust who was relentless in his questioning now the facts are not identical but they are very similar in that mr. Marshall was confined to a hospital bed connected to tubes and wires he couldn't just leave his clothing had been removed his shoes were gone there was the police officer stationed outside his door and we don't know what he thought about that but unreasonable inferences is that the officer was there to make sure he didn't leave although how he could have possibly thought he could leave under those conditions makes no sense to me but an officer was there making sure it didn't happen anyway and with all the the threats about using Sal's story and being stuck with it if he didn't confess now I think that crosses the line and it was coercive so this court should find the statement to be involuntary all right thank you for your argument thank you both for your advocacy we'll take that matter under advisement and go into the final case on the calendar please
judges: CHRISTEN, BENNETT, MILLER